[No. 3723.]

## LITHGOW ET AL. v. PEARSON.

1. STATUTES—*Construction.* The statutes of eminent domain are to be strictly construed. They pass only such estate or interest in the lands as is reasonably necessary to accomplish the purpose had in view in the condemnation proceeding.

2. EMINENT DOMAIN—*Title Acquired—Effect of Abandonment.* Where, in condemnation proceedings, the final order, under Rev. Stat., sec. 2420, authorizes the petitioner to take hold, etc., the premises described, "for railroad purposes," a mere easement or terminable fee is acquired. When the land is no longer used for the public purpose specified, the right so conferred reverts to the former owner, or his successor in interest.

The provision of Rev. Stat., sec. 2431, that the owner shall receive "the full and actual value," does not affect the result.

3. EVIDENCE—*Presumptions.* There is no presumption that those who assume to convey lands as the heirs of a decedent are, in fact, such heirs. Whoever claims under the conveyance has the burden of establishing their character as such.

*Appeal from Denver District Court.* HON. GEORGE W. ALLEN, Judge.

Mr. THOMAS B. STUART, Mr. CHARLES A. MURRAY for appellants.

Mr. HALSTEAD L. RITTER for appellee.

CUNNINGHAM, Presiding Judge.

In the view we take of this case it is only necessary to determine one of the contentions debated in the briefs and on oral argument, viz.: whether or not, under the statutes of our state, a right of way acquired by a railroad corporation by condemnation reverts to the original owner of the fee upon the same being abandoned by the corporation. Wherever the word "abandonment" appears in this opinion, we use it in the sense that the condemnor acquiring title to the land by condemnation for a public purpose has ceased to use it for such purposes. It is not necessary, and we shall not attempt, to carefully or fully state all of the facts presented by the record in this case. It is sufficient to say that the appellee, Bear Pearson, and the two appellants, were made defendants in a condemnation proceeding brought by the city and county of Denver for the purpose of acquiring a right of way for a street over certain lots in which the two appellants owned an interest, and in which the said Pearson claimed an interest, by virtue of certain quit claim deeds. Long prior to 1909, when the city filed its petition in condemnation, the Denver Circle Railroad Company had condemned a right of way across the lots which, after the road had been operated for a time, was abandoned and the tracks taken up, and for many years before the proceeding brought by the city, no attempt had been made by the railroad company or any successor to use the old railroad right of way for public purposes of any sort. After the abandonment of the right of way by the railroad company, by certain mesne conveyances Pearson became vested with whatever title, if any, the railroad company had at the time of said conveyances, to the narrow strip

of land which it had acquired by the early condemnation proceeding. If upon the abandonment of the right of way by the railroad company the title reverted to the fee owners, then Pearson had and has no title whatever, and the judgment must be reversed. Appellants urge other reasons than that of reversion to defeat any claims that Pearson might have in and to the land, but it is not necessary, in the view we take, to refer to them.

The right of way which the railroad company originally condemned was embraced within the much wider strip which the city sought to and did condemn for a street. The condemnation proceeding brought by the city resulted in a decree or order awarding it title to the entire strip which it sought to condemn for street purposes, and the controversy here between the appellants and the appellee is over the distribution of the money which the city has paid in to the clerk of the court, appellants contending that Pearson has no title whatever, and that the whole amount should be paid over to them, while Pearson contends that he owned, by reason of the conveyances aforesaid, the old railroad right of way, and, therefore, is entitled to participate in the fund paid in to the registry of the court by the city.

The eminent domain statutes, and the provisions of the constitutions of the various states on that subject are far from uniform. Whether or not the legislature of a state (there being no restriction in the constitution) possesses authority to provide for the taking of an undeterminable fee title to land in a condemnation proceeding is a question which we are not called upon to determine. The authorities are not entirely harmonious on this point, but the doctrine that eminent domain statutes must be strictly construed is pretty uniformly adhered to in all the states.—15 Cyc., 1018; 10 Am. & Eng. Enc. of Law (2nd ed.), 1068; *Pueblo v. Rudd,* 5 Colo., 272.

Section 2420, R. S., provides that after the value of

the land in a condemnation proceeding shall have been determined by certificate or verdict of a jury, the court or judge "shall make and cause to be entered in the minutes a rule describing such lands, real estate or claims, in manner aforesaid, such ascertainment of compensation, with the mode of making it, and each payment or deposit of the compensation as aforesaid, a certified copy of which shall be recorded and indexed in the recorder's office of the proper county in like manner and with like effect as if it were a deed of conveyance from the said owners and parties interested to the proper parties. Upon the entry of such rule the said petitioner shall become seized in fee except as hereinafter provided, of all such lands, real estate or claims described in said rule as required to be taken as aforesaid, and may take possession of and hold and use the same for the purposes specified in said petition * * * Provided any such right of way shall never give the petitioner any right, title or interest in any vein * * * existing in the premises condemned."

The controversy here, it will be readily perceived, turns upon the nature or character of the title which the condemnor acquired under the statutory provisions just quoted. If, as appellee contends, the title vested by the decree of the court is a fee simple absolute, then, of course, the doctrine of reversion cannot be invoked by appellants. But if, as appellants contend, under the language of our statute the decree of the court vests but a qualified, or, more accurately speaking, a terminable fee, then, upon the abandonment of the right of way, the condemnor and its successors lost whatever title they had, and it reverted to the original owners. It is said by counsel for appellee that no Colorado case has so far squarely decided whether, under our statutes, the condemnor takes a fee simple absolute title, or a terminable fee. With this statement we are disposed to agree. However, there

are, as we think, helpful intimations in various cases that have been before our courts of review. The opinion in *Great Western Ry. Co. v. Ackroyd,* 44 Colo., 454-6, 98 Pac., 726, upon a casual reading, might seem to sustain the contention made here by appellee, but we think a more careful reading will disclose little, if any, support for his view, and the same may be said of *Colorado Central R. R. Co. v. Allen,* 13 Colo., 299, 22 Pac., 605, cited and relied upon by appellee. In *St. Onge v. Day,* 11 Colo., 368, 18 Pac., 278, a case that was before the supreme court commission, and examined and adopted by the supreme court, there are intimations which at least tend to support the views advanced by appellants. On page 371 appears the following:

"A railway right of way, as a general rule, neces-. sarily carries with it an exclusive right *for railway purposes.*" [Italics ours.]

And, lest this qualifying phrase was not a sufficient warning to the bar, the court further said:

"It should not be inferred from what has been said that the railway company has the right to burden the property with any other or different use than that for which it was granted or acquired."

But the applicability of the opinion in the St. Onge case is made doubtful by the fact that the right of way there under consideration was a congressional grant to the railroad company, which, we believe, is never held to convey the fee.

In *Smith Canal or Ditch Co. v. C. I. & S. Co.,* 34 Colo., 485, 82 Pac., 940, 3 L. R. A. (N. S.), 1148, Mr. Justice Campbell, speaking for the court, uses this language:

"The petition in the condemnation proceeding says that the land sought to be taken was for a right of way for a ditch, and in its complaint here plaintiff states that in such proceeding it procured and obtained *a right of*

*way*, and its estate in this strip is thus designated more than once."

By italicising the words "right of way" it is apparent that Justice Campbell regarded them as significant. While Justice Campbell was speaking of what the petition in the *Smith Canal* case contained, the statute under which the proceeding in the instant case was brought also uses the phrase "right of way." Proceeding, Justice Campbell says:

"Possibly it is not necessary that the rule itself should so provide, and the order here which was entered by the probate court did not purport to specify the title or interest which the petitioner sought to acquire. The language quoted is susceptible of the meaning that two sorts of estates are contemplated—one a fee, the other a mere right of way or easement. It is also susceptible of the meaning that the kind of a fee contemplated *is not a technical fee;* for, by reason of the words following, the word 'fee' is merely an estate or interest which gives to the party seeking to condemn the exclusive right of possession of the strip sought to be held during its continuance as a corporation, only for the purposes of constructing and operating a ditch; if so, an easement or mere right of way would satisfy that purpose. *Considering the statute, then, as we should, as passing only such estate or interest as is reasonably necessary to accomplish the purpose in view,* and bearing in mind that the petitioner asked only for a right of way, and taking the construction which in its complaint the plaintiff itself has made of its own right, we are of opinion that merely a right of way or easement was acquired, and such, we hold, is the extent of the plaintiff's interest in this strip." [Italics ours.]

Four things would seem to appear from the last quotation from the Smith case: (1) That the supreme court regards the phrase, "right of way," as ordinarily

meaning an easement, and where the phrase, "right of way," is used, it may well be held to indicate that the condemnor was not seeking or taking a fee; (2) that the word "fee" is not always used in a technical sense; (3) that it is the duty of courts in construing eminent domain statutes to hold, wherever possible, that they are intended to pass only such estate or interest as is reasonably necessary to accomplish the purpose which the condemnor has in view; (4) that the construction which the petitioner has, in his complaint, placed upon his own right, or the fee which he seeks, is, if not controlling, at least entitled to consideration. It is true that the statute which Justice Campbell had under consideration in the *Smith Canal* case was the act of 1868, while section 2420, which we are here considering, was passed in 1872, yet it is not thought that the dissimilarity in the phraseology of the two acts is sufficient to make wholly inapplicable the announcements made in the *Smith Canal* case, to which we have already directed attention. The petition of the Denver Circle Railway Company in the condemnation proceeding which eventuated in the vesting of title in that corporation to the land here in dispute was not introduced on the trial of the case, but the decree rendered in favor of the railroad company contained the following language:

"It is further ordered that the said petitioner may take, retain, hold and use the said above described land for the purpose specified in said petition, to-wit, *for railroad purposes.*"

From what we have quoted from the decree it may fairly be presumed that in its petition The Denver Circle Railway Company voluntarily limited (if the statute did not require it to so limit) the purposes for which it sought to condemn the land and take the title. At all events the decree appears to have given it title, *"for railroad purposes" only,* and it could not convey a higher

title than it received; that is to say, it could not strengthen or add to the title by any mere words of conveyance in a deed made to a third party. If a mere easement or a terminable fee (which, if not the same thing, have many characteristics in common) was all that passed to. The Denver Circle Railroad Company in the condemnation proceeding, then all of the authorities agree that the land reverts, upon the condemnor ceasing to use it for public purposes.

It is true that section 2420 announces: "Upon the entry of such rule the said petitioner shall become *seized in fee,* except as hereinafter provided," but, following the phrase, "seized in fee," and in the same sentence in which it occurs, we find the following: "And it may take possession of and hold the same *for the purposes specified in said petition.*" This, we believe, is equivalent to saying that the petitioner may not take possession of and hold and use the land for any other purpose than that specified in the petition which the decree, as we have seen, states was "for railroad purposes." The maxim *expressio unius est exclusio alterius* here applies. At least, it is no violent stretching of the rule of statutory construction to so hold, and under the announcement made in the *Smith Canal* case, as to the duty of courts in interpreting statutes of this sort, we believe it is our duty to so construe this statute. The whole case of appellee is predicated upon the words, "seized in fee," which appear in the act, and to which we have already directed attention. The authorities clearly indicate that technical terminology cannot be permitted to conclusively determine the character of the title which passes in a condemnation proceeding. As we have already pointed out, Justice Campbell, in the *Smith Canal* case, intimates as much, and there is ample authority directly in point sustaining this view.

In 2 Wood on Railroads (1894), sec. 245, p. 898, it is said:

"The question as to the character of the estate authorized to be taken is to be determined more in reference to the nature of the use to which the land is to be devoted than from the use or omission of technical terms; and either the presence or absence of the words, 'in fee simple,' is not decisive of the character of the estate, although the language of the act has an important bearing upon the legislative intent in this respect."

And, on page 899, Mr. Wood says:

"But it will not be presumed that the legislature intended that a greater estate should be taken than is necessary for the purpose for which the power is conferred. * * * As to railroad companies, it is generally held in this country that to lands taken for their use in the construction of their railroads they do not, in the absence of an express provision to that effect in their charter, take the fee, but only an easement therein, the fee remaining in the owner and reverting to him when the use thereof for such purpose ceases, and its interest in the land is withdrawn."

Elliott on Railroads (1907), vol. 2, sec. 972; Mills on Eminent Domain (1888), sec. 317; Randolph on Eminent Domain (1894), secs. 213-216-221; *Abercrombie v. Simmons,* 71 Kans., 538, 81 Pac., 208, 114 Am. St. Rep., 509, 1 L. R. A. (N. S.), 806, 6 Ann. Cas., 239; *Smith v. City of Minneapolis,* 112 Minn., 446, 128 N. W., 819; *Fairchild v. St. Paul,* 46 Minn., 540, 49 N. W., 325.

In *Abercrombie v. Simmons, supra,* the supreme court of Kansas ruled that:

"An instrument in form a general warranty deed conveying a strip of land to a railroad company for a right of way does not vest an absolute title in the grantee. The interest conveyed is limited by the use for which the land is acquired, and upon the abandonment

of the use the property reverts to the adjoining owner.''

It is not necessary in the instant case for us to go so far as the rule announced in the *Abercrombie* case. We simply cite it as showing the tendency of the courts. Counsel for appellee calls attention to section 2431, R. S., which provides that:

''In estimating the value of all property actually taken, the true and actual value thereof at the time of the appraisement shall be allowed and awarded, and no deduction therefrom shall be allowed for any profit to the residue of said property;   *   *   *   that in all cases the owner or owners shall receive the full and actual value of all property actually taken.''

and he insists that it is unjust and inequitable (and therefore the legislature cannot be held to have so intended) to allow the owner of land, by the doctrine of reversion, to recover back that for which he has been fully compensated. At first blush one is disposed to concede the soundness of this contention, but the authorities appear to attach but little if any importance to this feature. The presumption always is that the condemnor is taking the land with the view of devoting it permanently to a public purpose; that the railroad or institution thus acquiring title by condemnation will be perpetuated. It is only upon this assumption that corporations have a right to meddle in the private affairs of citizens and interfere with private titles. Courts, in many instances at least, have declined to instruct juries that they may take into consideration the possibility of the reversion of the title in fixing the damage that should be allowed to the owner of the fee, and this, too, in states where the doctrine of reversion is firmly established.

''While the right of way for a railroad condemned under the statute is an easement and the fee remains in the owner of the land condemned, yet it is not proper to so instruct the jury in an appeal from condemnation pro-

ceedings unless it is made to appear that the fee, burdened with the easement, is of some determinative value to the owner, which is not ordinarily the case."—*Clayton v. C. & D. R. Co.*, 67 Ia., 238, 25 N. W., 150.

Moreover, it should be remembered in connection with the seeming injustice of permitting the fee owner, upon abandonment by the condemnor, to take back the title to his land after having received its full value, that this so-called value is fixed, not by the owner; he is forced to accept whatever value others may place upon his land. With the condemnor the situation is quite different; if he is not satisfied with the valuation fixed by a commission or jury, he may decline to pay the damages assessed. It is no great price to pay for the right to use the imperial power of eminent domain, which requires of the condemnor that when he shall have permanently ceased to use that which he has taken for a public purpose, he shall abandon the title, as well as the physical possession, and permit both to revert to the one from whom, by the power of sovereignty alone, he was able to wrest it. It might be well also to bear in mind that when an abandonment of a right of way occurs, the condemnor ordinarily leaves a whole community in worse condition than when he found it. That is to say, after having established a railroad and encouraged investments and improvements upon the faith of its perpetuity, ordinarily he inflicts a serious injury upon the community through which the road has been operated when he completely abandons and ceases to operate the same.

In *Farmer v. Treasury Co.*, 35 Colo., 595, 83 Pac., 465, 4 L. R. A. (N. S.), 106, Mr. Justice Gabbert, speaking for the court, says:

"The authority to exercise the right of eminent domain for public use is based upon the theory that property is granted the subject upon condition that it may be retaken to serve the necessities of sovereign power;

to this end agencies created by the state, the purpose of which is to serve the public, may exercise this right."

that is to say, the sovereign may take from the subject that which the former has granted the latter, provided always, the retaking be for a public or sovereign purpose. We are not unmindful of section 14, article 2 of our constitution which, under certain circumstances, permits private property to be taken for seemingly private purposes, but in reality we believe consideration for the public welfare enters into the purposes enumerated in said section. But even if this view be not tenable, still the cases referred to in said section are *sui generis,* forming a distinct exception to the general rule, if it be granted that the purposes enumerated in said section are not *quasi-*public in their nature.

It follows from what we have already said, that the highest title which the subject can take, call it by whatever name we may, is always qualified by this higher right of the public exercised, directly or indirectly, through and by its sovereign. But when the sovereign has bestowed upon the subject the highest possible title, it is impossible for the sovereign, *in invitum,* again to repossess himself of his former absolute title. Whatever title the sovereign thereafter thus acquires is a qualified or terminable one. If the subject may not hold or retain the title to his land to the prejudice of the public weal, no more can the sovereign (or any agent exercising the power of sovereignty) retain the title taken from the subject for the public weal, after such retention permanently ceases to advance the purpose for which the land was taken. Or, otherwise stated, if the sovereign may retake only for a public purpose, he may continue to hold that which has been retaken only so long as such holding promotes the public good. Permanent abandonment of the use of the property for the public good must result in the reversion of the title. The sovereign has no inherent or

superior power merely because he is a sovereign. His power is the power to serve, not to despoil. He may take from one subject for the purpose of bestowing upon all subjects; more he cannot do. In these modern times sovereign power is not despotic power, and when the state delegates the power of eminent domain to a corporation or individual, the agent clothed with this regal prerogative must act for all. Not only in the matter of the taking must the agent of sovereignty so act, but in the matter of the retention of the thing taken as well. Such agent is not permitted, under our statutes, at least, to assume in the first act the role of a benign, constitutional sovereign, and in the last that of an unbridled autocrat. The power to take being qualified, the title taken must be likewise qualified. Nor can this fundamental principle, as we have seen, be destroyed by the mere fact that constitutions and statutes may require the condemnor to pay full value for the thing taken. Any other view would permit a railroad company, for instance, to acquire title to real estate by the power of eminent domain, and thereupon abandon its original purpose and sell its right of way so taken to private parties, without ever having put it to the use for which alone, under our statutes, title to the same could be acquired. Fortunately, the language of our act does not require a construction leading to such results.

Our conclusion is that the Denver Circle Railway Company took a terminable or qualified fee in the right of way here involved, which was liable to be defeated whenever it ceased to use the land for the purpose contemplated by our constitution and the decree rendered in its favor. And it follows, since the evidence clearly establishes absolute and permanent abandonment of this right of way by the said company, that appellee's pretended title to the land condemned by the city, and involved in this proceeding, is without foundation.

The judgment of the trial court is reversed, and the cause remanded for further proceedings in harmony with the views herein expressed.

*Judgment Reversed.*

KING, J., specially concurring:

I concur in the conclusion reached by the court resulting in the reversal of the judgment, but limit my concurrence in the opinion to so much thereof as is necessary to a determination of the issues in this case. With that part of the opinion which declares that under no circumstances, as the law is now written, can an absolute fee be taken from the owner *in invitum*, and vested in the petitioner by proceedings under the eminent domain statute, and with that part which holds, or from which it necessarily follows, that the general assembly has not the power to enact a law by virtue of which such an estate may be taken, I do not concur. Upon those questions, I express no opinion. Such declarations, not being necessary to a determination of this case, are mere *dicta*.

I am authorized to state that HURLBUT, J., and BELL, J., join me in limiting concurrence as herein expressed.

---

### On Rehearing.

Counsel for appellee in his petition for rehearing makes no complaint concerning the conclusion reached by us in the original opinion handed down in this case, in so far as we determined that his client, Bear Pearson, obtained no title to the land involved by reason of the deed which he obtained from the railroad company, or its grantees. But he calls our attention to the fact that as to the thirty feet of lot 14, block 15, being the property claimed by appellant Lederer, Pearson claims title through another and second source, viz.: a quit claim deed from the alleged heirs of one A. B. McKinley, the said McKinley having purchased the property at a foreclosure sale of a trust deed given by one Jacox, long prior to the time that

the said Lederer obtained the title upon which she relied by quit claim deed from the heirs of the said Jacox. The appellants on the trial, in their briefs filed in this court, and on oral argument challenged the sufficiency of Pearson's proof of his alleged title derived from the said McKinley, and inasmuch as appellee at no time (prior to the filing of his petition for rehearing) attempted to answer the arguments or meet the authorities offered by appellants in this behalf, we assumed that he had abandoned this point, or did not desire to press it, hence we made no direct reference to it in the original opinion. Moreover, no authorities are cited by appellee in his brief on rehearing to support his contention that he properly proved his alleged title derived from the heirs of McKinley. The record discloses that on the trial appellee offered a quit claim deed dated April 28, 1910, long after the complaint in this case had been filed, which quit claim deed recites that:

"Mary W. Burns and Ellis M. Johnson, both formerly McKinley, and being the sole and only heirs of Alexander B. McKinley, deceased, in consideration of $1.00, convey to Bear Pearson the east thirty feet of Lot 14, Block 15," etc.

To this offer the appellant, Lederer, through her counsel, then and there objected, "for the reason that there is nothing to show that these parties are the heirs of Alexander B. McKinley." This objection was well taken, and should have been sustained. Neither then nor later did Pearson attempt, on the trial below, so far as the record discloses, to make any proof whatever of the heirship of Burns and Johnson, or the death of their alleged ancestor, McKinley. An excellent discussion of this question will be found in *Dyer v. Marriott,* 89 Kans., 515, 131 Pac., 1185-8.

Abundant authorities are cited and quoted from in the Dyer case to support the rule that:

"When one attempts to derive title to land through the heirs of a former proprietor, the fact of heirship must be proved. This cannot be done by recitals, merely, in the deed, especially where the deed is of recent date, which, at most, amounts to a mere claim of heirship."

It will be seen that Pearson as completely failed to prove the title which he attempted to trace from McKinley as he failed in his attempt to prove the title which he claimed from the railroad company.

The petition for rehearing will be denied.

Decided July 14, A. D. 1913. Rehearing denied October 14, A. D. 1913.